RECEIVED

APR 23 2020

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY
DEPUTY CLERK

FILED

MAY - 5 2020

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA, *ex rel.* ELISSA L. WHITE; and ELISSA L. WHITE, *individually*,

Plaintiffs;

v.

2011 BANDERA ROAD, LLC,

Defendant.

Cause No. 5:20-cv-488

Civil action

FB

**PLAINTIFF'S ORIGINAL COMPLAINT**
**[FILED UNDER SEAL]**

## I. INTRODUCTION

1. This is a *qui tam* action is brought under the False Claims Act, 31 U.S.C. §§ 3729 & 3730, and under various Texas state-law causes of action.

2. Plaintiff and *qui tam* relator Elissa L. White ("Ms. White") rented an apartment from Defendant 2011 Bandera Road, LLC ("Defendant") for herself and her two young daughters through a federally regulated rent-subsidy program known as the Section 8 Tenant-Based Housing Choice Voucher Program ("Section 8").

3. Under the Section 8 program, landlords like Defendant receive some or all of a tenant's rent from a local housing authority—in this case, the San Antonio Housing Authority ("SAHA"). In order to receive rent-subsidy payments from SAHA, landlords like Defendant must enter into a contract with SAHA known as a Housing Assistance Payment ("HAP") contract, which includes a tenancy addendum enforceable by the tenant.

4. The HAP contract in this case, as these contracts always do, defined how much rent Defendant would receive from SAHA and how much it would receive from Ms. White.

5. In this case, SAHA paid 100 percent of Ms. White's rent every month; her portion of the rent was $0. Since SAHA was paying all of Ms. White's rent, the HAP contract barred Defendant from accepting any rent from Ms. White.

6. Nonetheless, Defendant demanded that Ms. White pay between $120 and $295 in "rent" every month from November 2017 until September 2018. This "rent" was in fact based on nothing at all—it was simply excess rent that Ms. White did not owe under any contract.

7. In those eleven months, Defendant illegally charged Ms. White $2,170 in excess rent; meanwhile, SAHA was paying 100 percent of her rent each month.

8. All the while, Defendant certified to SAHA—both expressly and implicitly—that it was complying with the HAP contract. Each time Defendant misrepresented its compliance with the HAP contract, Defendant made a false claim in violation of federal law.

9. On or about December 18, 2018, Ms. White, through counsel, demanded the return of the excess rent, and Defendant ignored that demand.

10. Ms. White, as *qui tam* relator, brings this action on behalf of the United States of America ("United States"), seeking all remedies available under the False Claims Act. She also seeks a relator's statutory share of all damages and civil penalties awarded to the United States under the False Claims Act, as well as her costs and reasonable attorney's fees.

11. The United States seeks all remedies available under the False Claims Act.

12. Ms. White, on her own behalf, also seeks damages and other remedies under Texas law for breach of contract; fraud; and the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Com. Code § 17.46.

## II. JURISDICTION

13. This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under 31 U.S.C. § 3729.

## III. VENUE

14. Defendant committed its unlawful acts in Bexar County, Texas. Venue is therefore appropriate in the San Antonio Division of the United States District Court for the Western District of Texas under 28 U.S.C. § 1391(b) because it is a judicial district in which the defendant resides. Defendant is a resident of the forum state, Texas.

## IV. PARTIES

15. Plaintiff and *qui tam* relator Elissa Lakricha White was a tenant at a multifamily apartment complex called the Park on Bandera Apartments, located at 2011 Bandera Road, San Antonio, Texas 78228, from November 2017 until October 2018. She is currently a resident of Bexar County, Texas.

16. Defendant 2011 Bandera Road, LLC is a corporate entity that owns the Park on Bandera Apartments. Its main office is located in Bexar County, Texas; all of the property it owns is located in Bexar County, Texas; and its registered agent for service is located in Bexar County, Texas. Defendant's registered agent for service, The Law Office of David E. Dilley, PLLC, can be served at 5255 San Pedro, San Antonio, Texas 78212.

## V. FACTUAL ALLEGATIONS

### A. The Section 8 Program

17. The federal government created the Section 8 program to help low-income families obtain decent and affordable rental housing.

18. The United States Department of Housing and Urban Development ("HUD") administers the program.

19. HUD enters into annual contribution contracts with local public housing agencies such as SAHA to implement the Section 8 program and other initiatives. Under those contracts, HUD provides SAHA with money that SAHA then uses to provide rent subsidy payments on behalf of low-income families in the form of Section 8 housing vouchers.

20. Low-income families must apply to SAHA to receive a Section 8 voucher. Because of the high demand for vouchers in San Antonio, families typically wait three to five years for the applications to be considered.

21. Once a low-income family gets through the waiting list, they are screened for eligibility. If they are eligible, SAHA provides them with a voucher and the family then must look for a landlord that will lease them a dwelling unit through the Section 8 program.

22. Once a family finds a rental unit, they must submit the proposed lease to SAHA for approval, and SAHA inspects the rental unit.

23. If the rental unit passes inspection and SAHA approves the lease, then SAHA enters into a contract with the landlord under which it will provide rent-subsidy payments to the landlord during the term of the lease.

24. That contract is called a Housing Assistance Payment ("HAP") contract, and it includes a tenancy addendum that is enforceable by the tenant.

**B. Ms. White Received a Section 8 Voucher and Rented an Apartment from Defendant**

25. Ms. White applied for a Section 8 voucher from SAHA in December 2013. She then waited two years for her application to be removed from the waitlist and approved in late 2015.

26. In 2017, Ms. White needed to move to a new apartment, so she went shopping for an apartment to rent for herself and her two young daughters. She ultimately settled on the Park on Bandera Apartments, located at 2011 Bandera Road, San Antonio, Texas 78228.

27. The Park on Bandera Apartments are a 260-unit apartment property owned by Defendant, a limited liability corporation incorporated under the laws of the State of Texas.

28. Ms. White met with the property manager, Esmerelda Ahmad, who agreed to rent Ms. White and her daughters a two-bedroom unit at the Park on Bandera Apartments.

29. Ms. Ahmad held herself out as, and acted as, agent for Defendant in committing all conduct described in this complaint.

30. Ms. Ahmad committed all the conduct described in this complaint within the course and scope of her employment as a property manager for The Park on Bandera Apartments.

31. Ms. White agreed to a 12-month lease beginning on November 8, 2017.

32. The lease set Ms. White's rent at $750 per month.

33. In the lease, Defendant agreed to pay for water, sewer, and trash collection itself without passing those costs on to Ms. White.

34. In the lease, Ms. White agreed to pay for electricity directly to the utility company.

35. Therefore, under the lease, Ms. White was not to make any payments to Defendant for utilities.

36. The HAP contract likewise required Ms. White to make no payments to Defendant for utilities.

37. The lease also set a late fee if rent was paid after the 5th day of the month: $50 for the first day, and $5 per day for up to 15 days until full payment is received, for a maximum late fee of $125 in a given month.

38. Ms. White and Ms. Ahmad—on behalf of Defendant—executed the lease on November 3, 2017.

39. On the same day, Ms. Ahmad signed an "Owner Certification Form" provided by SAHA on behalf of Defendant.

40. In that form, Ms. Ahmad initialed next to a paragraph labeled "Participant Rent Payments." That paragraph reads, "I understand that SAHA determines the Participant's portion of the contract rent and that it is illegal to charge additional amounts for rent or any other item not specified in the lease that have not been specifically approved by SAHA."

41. SAHA inspected the apartment on November 7, 2017.

42. Ms. White and Defendant submitted the lease to SAHA for its approval on November 8, 2017.

43. The apartment passed SAHA's inspection and SAHA approved the lease.

44. Ms. White and her family moved into her apartment at The Park on Bandera Apartments in November 2017.

45. A copy of that lease is attached to Plaintiff's Original Complaint as Exhibit A and incorporated into this pleading by reference.

## C. The HAP Contract

46. After Ms. White moved in, SAHA sent Defendant a HAP contract to sign on December 19, 2017.

47. A copy of that HAP contract is attached to Plaintiff's Original Complaint as Exhibit B and incorporated into this pleading by reference.

48. The HAP contract between SAHA and Defendant defines the terms and conditions under which SAHA agreed to provide monthly rent-subsidy payments to Defendant for Ms. White's benefit.

49. The HAP contract specifies in Part A, labeled "Contract Information," that the "rent to owner" is $750 and the "the housing assistance payment by [SAHA] to the owner is $750." HAP Contract, ¶¶ A.6, A.7.

50. The HAP contract also states that Ms. White will "provide or pay for" her electricity but that Defendant will "provide or pay for" Ms. White's water, trash, and sewer utilities. HAP Contract, ¶ A.8.

51. The HAP contract includes the following provisions in Part B, labeled "Body of Contract":

a. "The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit." HAP Contract, ¶ B.7.d.

b. "During the term of this contract, the owner certifies that . . . [e]xcept for the rent to the owner, the owner has not received and will not receive any payments

or other consideration (from the family . . . or any other public or private source) for rental of the contract unit during the HAP contract term." HAP Contract, ¶ B.8.d.

c. "If . . . the owner is not entitled to the housing assistance payment or any part of it," SAHA "may deduct the amount of overpayment from any amounts due the owner." HAP Contract, ¶ B.7.f.

d. "Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract." HAP Contract, ¶ B.7.b.

e. The HAP contract defines the following actions by the owner as a breach of the HAP contract: "[i]f the owner has violated any obligation under the HAP contract" and "[i]f the owner has committed fraud . . . in connection with any Federal housing assistance program." HAP Contract, ¶ B.10.a.(1), (3).

f. The HAP contract provides that if SAHA "determines that a breach has occurred," it "may exercise any of its rights and remedies, which include "suspension of housing assistance payments," "termination of housing assistance payments," and "termination of the HAP contract." HAP Contract, ¶ B.10.b.

52. The HAP contract includes the following provisions in Part C, labeled "Tenancy Addendum":

a. "The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment." HAP Contract, ¶ C.5.a.

b. "The tenant is not responsible for paying the portion of the rent to owner covered by the PHA housing assistance payment . . . ." HAP Contract, ¶ C.5.d.

c. "The owner may not charge or accept, from the family or from any other

source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities, and appliances to be paid by the owner in accordance with the lease." HAP Contract, ¶ C.5.e.

d. "The owner must immediately return any excess rent payment to the tenant." HAP Contract, ¶ C.5.f.

e. "The owner must notify [SAHA] of any changes in the amount of rent to owner at least sixty days before any such changes go into effect . . . ." HAP Contract, ¶ C.15.d.

f. "The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control" HAP Contract, ¶ C.2.b.

53. Jeff Trif, an executive officer for Defendant, signed the HAP contract on behalf of Defendant on December 20, 2017.

54. Mr. Trif reviewed the HAP contract before signing it and understood its contents.

55. A representative for SAHA signed the HAP contract on the same day.

56. Ms. Ahmad received a copy of the HAP contract and reviewed it in December 2017.

57. In December 2017, Ms. Ahmad also received a form from SAHA labeled "Final Rent Change to Housing Assistance Payment Contract." That form lists the contract rent as $750, the resident rent as $0, and the housing assistance payment as $750.

58. SAHA and Defendant never modified, rescinded, or superseded the HAP contract until SAHA terminated the contract on January 31, 2019, for reasons not related to this lawsuit.

**D. Defendant Repeatedly Violated the HAP Contract by Demanding and Accepting Excess Rent from Ms. White**

59. SAHA made the first of its HAP contract payments to Defendant on January 17,

2018.

60. On that date, SAHA made three payments to Defendant: one for $575, and two for $750.

61. The $575 payment was a prorated payment for November 2017's rent, and the two $750 payments were for December 2017 and January 2018 rent.

62. SAHA then made eleven more payments of $750 to Defendant—another at the end of January 2018, and then again at the end of each month until November 29, 2018.

63. Altogether, SAHA paid Defendant $10,325 in HAP contract payments between January 17, 2018, and November 29, 2018.

64. Defendant accepted each of those fourteen HAP contract payments from SAHA and deposited them in a bank account belonging to Defendant.

65. All the while, Defendant—through its agent Ms. Ahmad—charged Ms. White between $120 and $295 in excess rent each month, even though Ms. White's portion of the rent to owner under her HAP contract was $0.

66. Every month, Ms. Ahmad would call Ms. White by phone to tell her that her "rent" was late and that she needed to come to Ms. Ahmad's office to make a "rent" payment.

67. Ms. Ahmad never asked for these payments in writing and never gave Ms. White a written invoice or statement.

68. Ms. Ahmad did provide Ms. White with receipts for several months of payments.

69. Ms. Ahmad told Ms. White that the payments were for rent, utilities, or late fees that Ms. White did not in fact owe.

70. Ms. White made each of the payments by bringing a money order in person to Ms. Ahmad at her office.

71. Mistakenly believing Ms. Ahmad to be acting in good faith, Ms. White did not dispute the amounts that Ms. Ahmad demanded in payment each month.

72. Several of the tenants at The Park on Bandera Road Apartments receive Section 8 assistance, and Ms. Ahmad was familiar with how those assistance payments are made.

73. Ms. Ahmad understood that SAHA paid some or all of a Section 8 tenant's rent and that the tenant paid the remainder.

74. Ms. Ahmad understood that some Section 8 tenants pay no rent.

75. By December 20, 2017, Ms. Ahmad knew that SAHA had a HAP contract with her employer specifying Ms. White's portion of the rent.

76. By December 20, 2017, Ms. Ahmad knew that SAHA paid all Ms. White's rent each month, that Ms. White's portion of the rent was $0, and that Ms. White did not pay any utilities to Defendant under the HAP contract.

77. Despite knowing that Ms. White owed no rent or utilities under her lease and the HAP contract, Ms. Ahmad charged Ms. White for "rent" and "utilities" for eleven months.

78. Moreover, Ms. Ahmad, who signed the lease on November 3, 2017, knew that late fees could be assessed only for late-paid rent.

79. Ms. Ahmad knew that because SAHA paid all of Ms. White's monthly rent, Ms. White could not be charged late fees based on the date that a rent payment was received.

80. Despite knowing that Ms. White could not owe late fees at all because she did not owe rent, Ms. Ahmad charged and collected late fees from Ms. White on multiple occasions.

81. The so-called charges for "rent," "utilities," and "late fees," charged and collected without any reasonable good-faith basis, were in fact excess rent charges.

82. Ms. Ahmad acted in her capacity as an employee and agent of Defendant in collecting and charging Ms. White for excess rent for eleven months.

83. In November 2017, Defendant charged Ms. White a total of $195: $120 for "rent" and $75 for "utilities."

84. In December 2017, Defendant charged Ms. White a total of $195: $120 for "rent"

and $75 for "utilities."

85. In January 2018, Defendant charged Ms. White a total of $195: $120 for "rent" and $75 for "utilities."

86. In February 2018, Defendant charged Ms. White a total of $295: $120 for "rent," $75 for "utilities," and $100 for "late fees."

87. In March 2018, Defendant charged Ms. White a total of $195: $120 for "rent" and $75 for "utilities."

88. In April 2018, Defendant charged Ms. White a total of $195: $120 for "rent" and $75 for "utilities."

89. In May 2018, Defendant charged Ms. White a total of $195: $120 for "rent" and $75 for "utilities."

90. In June 2018, Defendant charged Ms. White a total of $195: $120 for "rent" and $75 for "utilities."

91. In July 2018, Defendant charged Ms. White a total of $195: $120 for "rent" and $75 for "utilities."

92. In August 2018, Defendant charged Ms. White a total of $120 for "rent."

93. In September 2018, Defendant charged Ms. White a total of $195: $120 for "rent" and $75 for "utilities."

94. Altogether, Defendant charged Ms. White $2,170 in excess rent between November 2017 and September 2018.

95. Neither HUD nor SAHA knew about or authorized any of these excess rent payments.

96. Defendant never told SAHA it had demanded or accepted any of these excess rent payments.

97. Defendant knew that accepting each of these excess rent payments was a violation of

the HAP contract.

98. Every time Defendant accepted and deposited HAP contract payments from SAHA each month, Defendant knew that it was in breach of the HAP contract.

99. Defendant knew that SAHA could terminate the HAP contract at any time after November 2017 based on any one of their repeated breaches of that contract.

100. On or about November 5, 2018, Ms. White notified SAHA that Defendant had demanded excess rent payments from her. SAHA contacted Defendant and demanded that Defendant return the excess rent payments to Ms. White. Defendant ignored that demand.

101. On or about December 18, 2018, Ms. White, through counsel, demanded the return of the excess rent, and Defendant ignored that demand.

## VI. CAUSES OF ACTION

### A. False Claims Act – 31 U.S.C. §§ 3729, 3730

102. Defendant repeatedly made fraudulent statements to SAHA over the course of nearly a year in order to induce SAHA to continue making monthly housing assistance payments under the HAP contract.

103. Defendant created false records by executing the HAP contract and Owner Certification Form and thereby representing that it would not charge additional rent to Ms. White, despite knowing at that time that it had already charged her additional rent and intended to continue doing so, and despite knowing that it was a violation of the HAP contract to charge Ms. White such additional rent. The presentation of each of these two false records separately violated 31 U.S.C. § 3729(a)(1)(B).

104. Each time that Defendant, through its agents, endorsed and presented a housing assistance payment check while knowingly receiving excess rent from Ms. White, and while knowing that such excess rent collections violated the HAP contract, constitutes a separate false claim or representation to the United States that Defendant did not receive any other consideration for the

rented premises for that month as set forth in the HAP contract.

105. The presentment of each of these eleven false claims for payment separately violated 31 U.S.C. § 3729(a)(1)(A).

106. Defendant intentionally failed to report to SAHA the excess rent collected each month from Ms. White, knowing that to report such conduct would be to report repeated violations of the HAP contract, which would lead SAHA to terminate the HAP contract.

107. Defendant knowingly made all these false statements, false certifications, and intentional omissions for the purpose of inducing SAHA to make housing assistance payments each month—payments that SAHA would not have made had it known that Defendant was repeatedly breaching the HAP contract.

108. Defendant's knowing false statements, false certifications, and intentional omissions did in fact cause SAHA to make housing assistance payments each month for eleven months—fourteen payments in all, totaling $10,325 in value—that it would not have made had it known that Defendant was repeatedly breaching the HAP contract.

109. The United States suffered actual damages as a result of Defendant's repeated violations of the False Claims Act because the housing assistance payments which HUD disbursed to SAHA for payment to Defendant through the Section 8 program on behalf of Ms. White would not have been paid to Defendant but for its false claims, false certifications, and intentional omissions.

110. The United States suffered damages equal to all payments made to Defendant pursuant to the HAP contract, since Defendant's first false statements were made before the first housing assistance payment was made, and since Defendant's false statements continued for the duration of the period during which SAHA made housing assistance payments.

111. Those damages total $10,325.

112. Ms. White, as *qui tam* relator, is entitled to receive a portion of the proceeds of this

action, as well as an award of her costs and reasonable attorney's fees. 31 U.S.C. § 3730(d).

**B. BREACH OF CONTRACT**

113. SAHA and Defendant entered into the HAP contract for the sole purpose of benefitting a third party: Ms. White.

114. The HAP contract expressly states that its purpose is "to provide assistance for [Ms. White] under the Section 8 voucher program."

115. The HAP contract operates entirely for Ms. White's benefit by providing rent payments to Defendant on her behalf.

116. The HAP contract expressly provides that Ms. White is a third-party beneficiary who may enforce the terms of Part C of the HAP contract (the Tenancy Addendum) against Defendant.

117. The HAP contract is a valid contract, as it was supported by consideration from both SAHA (a promise to make monthly assistance payments) and Defendant (a promise to lease an apartment to Ms. White).

118. SAHA fully performed their obligations under the HAP contract by making timely assistance payments in accordance with the contract's terms.

119. Defendant breached the HAP contract by charging and collecting additional rent to Ms. White and by failing to return 11 excess-rent payments to Ms. White in violation of Part C, paragraph 5(f) of the HAP contract .

120. Ms. White was damaged by Defendant's breaches of Part C the HAP contract because she paid Defendant $2,170 that she did not owe under the lease or the HAP contract, or for any other reason, and Defendant failed to return those payments as required by Part C.

**C. FRAUD**

121. Defendant materially misrepresented Ms. White's contractual obligations when its agent Ms. Ahmad demanded that Ms. White pay "rent," "utilities," and "late fees" even though she knew that Ms. White's rent obligation under the lease and the HAP contract was $0, that she did not

owe Defendant for utilities under the lease or the HAP contract, and that she could not be charged late fees for non-payment of rent she did not owe.

122. Defendant knew these demands for "rent, utilities, and late fees" were false, since its agent Ms. Ahmad signed the lease on Defendant's behalf and she knew that, under the HAP contract, Ms. White's rent portion was $0.

123. Defendant's representations to Ms. White that she was required to pay "rent, utilities, and late fees" every month were intended to, and did, induce Ms. White to tender payments to Defendant.

124. Ms. White justifiably relied on Defendant's representations because she was reasonably concerned that the failure to comply with Defendant's demands for payment could result in her eviction.

125. Ms. White was damaged in the amount of $2,170 because of Defendant's repeated fraudulent misrepresentations that Ms. White owed "rent, utilities, and late fees."

126. Ms. White seeks exemplary damages for Defendant's fraudulent conduct.

## D. TEXAS DECEPTIVE TRADE PRACTICES ACT

127. The Texas Deceptive Trade Practices Act ("DTPA") provides a cause of action for consumers against any person who employs certain employment by any person of a false, misleading, or deceptive act or practice that is relied on by the consumer to her detriment. Tex. Bus. & Com. Code § 17.50.

128. Ms. White is a consumer within the meaning of the DTPA because she leased a good—an apartment—from Defendant, and it employed deceptive trade practices in the provision of that apartment.

129. Defendant knowingly committed deceptive trade practices within the meaning of the DTPA by representing that the lease in conjunction with the HAP contract conferred upon them the right to collect "rent," "utilities," and "late fees" from Ms. White when in fact those instruments

did not and when Defendant knew those instruments did not.

130. Defendant knowingly and intentionally committed deceptive trade practices within the meaning of the DTPA by representing that the lease in conjunction with the HAP contract conferred upon Ms. White the obligation to pay "rent," "utilities," and "late fees" when in fact those instruments did not and Defendant knew those instruments did not. Tex. Bus. & Com. Code §§ 17.46(b)(12), 17.50(a)(1).

131. Defendant's conduct, moreover, constitutes an unconscionable act or course of conduct within the meaning of the DTPA. Tex. Bus. & Com. Code § 17.50(a)(3).

132. Defendant's deceptive trade practices were the producing cause of Ms. White's injury: she would not have paid them $2,170 for "rent," "utilities," and "late fees" had Defendant not misrepresented Ms. White's rights and obligations under the lease.

133. Defendant's knowing and intentional conduct caused Ms. White mental anguish.

134. Ms. White seeks actual and exemplary damages resulting from Defendant's knowing and intentional conduct pursuant to Tex. Bus. & Com. Code § 17.50.

**E. TEXAS DEBT COLLECTION ACT**

135. The Texas Debt Collection Act ("TDCA") provides a private right of action for consumers against debt collectors who use prohibited debt collection practices. Tex. Fin. Code § 392.403.

136. Defendant is a debt collector within the meaning of the TDCA because its agent Ms. Ahmad directly engaged in debt collection by soliciting collection for consumer debts when she called Ms. White to demand payment for sums allegedly owing under the Lease.

137. Defendant engaged in a prohibited debt-collection practice against Ms. White when Ms. Ahmad misrepresented the character, extent, or amount of Ms. White's consumer debt in the manner described throughout this complaint. Tex. Fin. Code § 392.304(a)(8).

138. Defendant's misrepresentations injured Ms. White by inducing her to make

payments that were not actually owed under the Lease, the HAP contract, or any other agreement.

139. Ms. White seeks to recover actual damages caused by Defendant's illegal debt-collection practices and to recover her reasonable attorney's fees and costs. Tex. Fin. Code § 392.403(a), (b).

## VII. PRAYER FOR RELIEF

140. Ms. White, on behalf of herself and the United States, respectfully ask the Court to grant the following relief:

a. Assess a civil penalty against Defendant for each separate violation of the False Claims Act in the amount of not less than $5,000 and not more than $10,000, pursuant to 31 U.S.C. § 3729(a)(1);

b. Award the United States three times the amount of actual damages that it sustained as a result of Defendant's conduct, pursuant to 31 U.S.C. § 3729(a)(1);

c. Award Ms. White a *qui tam* relator's share of the proceeds or settlement pursuant to 31 U.S.C. § 3730(d);

d. Award Ms. White court costs, costs of litigation, and reasonable attorney's fees pursuant to 31 U.S.C. § 3730(d), Tex. Civ. Prac. & Rem. Code § 38.001, Tex. Bus. & Com. Code § 17.50(d) and Tex. Fin. Code § 392.403(b);

e. Award Ms. White actual damages resulting from Defendant's breaches of contract, fraud, deceptive trade practices, and illegal debt-collection practices;

f. Award Ms. White exemplary damages in the amount of three times her economic damages and three times her mental anguish damages resulting from Defendant's unconscionable conduct and from its knowing and intentional deceptive trade practices, pursuant to Tex. Bus. & Com. Code § 17.50(b)(1);

g. Award Ms. White exemplary damages based on Defendant's fraudulent conduct;

h. Award Ms. White pre- and postjudgment interest; and

i. Grant the United States and Ms. White any other relief the Court deems proper.

DATED: April ~~20~~ 23, 2020.

Respectfully submitted,

TEXAS RIOGRANDE LEGAL AID
1111 North Main Ave.
San Antonio, Texas 78212
astamm@trla.org
Telephone: (210) 212-3700 ext. 3728
Telefax: (210) 212-3774

BY: /s/ Alex Stamm
ALEXANDER A. STAMM
State Bar No. 24101052
ATTORNEY FOR PLAINTIFF/RELATOR

**Exhibit A**


TEXAS APARTMENT ASSOCIATION



# Apartment Lease Contract

**This is a binding contract. Read carefully before signing.**

Date of Lease Contract: November 3, 2017 (when this Lease Contract is filled out)

## Moving In — General Information

1. **Parties.** This Lease Contract ("Lease") is between you, the resident(s) (*list all people signing the Lease*): ELISSA WHITE

and us, the owner: The Park on Bandera (**name of apartment community or title holder**). **You are renting Apartment No.** 1010, at 2011 Bandera Road (street address) in San Antonio (city), Texas 78228 (zip code) for use as a private residence only. The terms "you" and "your" refer to all residents listed above or, in the event of a sole resident's death, to someone authorized to act for the estate. The terms "we," "us," and "our" refer to the owner listed above and not to property managers or anyone else. ***Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease is the entire agreement between you and us.***

2. **Occupants.** The apartment will be occupied only by you and (*list all other occupants not signing the Lease*): [redacted]

—and no one else. Anyone not listed here cannot stay in the apartment for more than ____ consecutive days without our prior written consent, and no more than twice that many days in any one month. ***If the previous space isn't filled in, 2 days total per month will be the limit.***

3. **Lease Term.** The initial term of the Lease begins on the 8 day of November (month), 2017 (year), and ends at midnight the 30 day of November (month), 2018 (year). After that, this Lease will automatically renew month-to-month unless either party gives at least 30 days' written notice of termination or intent to move out as required by Par. 36. ***If the number of days isn't filled in, notice of at least 30 days is required.***

4. **Security Deposit.** The total security deposit for all residents is $ 300.00, due on or before the date this Lease is signed. This amount [**check one**]: ☐ does *or* ☐ does not include an animal deposit. Any animal deposit will be designated in an animal addendum. Security-deposit refund check and any deduction itemizations will be by [**check one**]:
   - ☐ one check jointly payable to all residents and mailed to any one resident we choose, *or*
   - ☐ one check payable to and mailed to ____ (specify name of one resident).

   If neither option is checked here, the first option applies. See Par. 40 and 41 for security-deposit return information.

5. **Keys, Move-Out, and Furniture.** You'll be given 1 apartment key(s), 1 mailbox key(s), and ____ other access devices for ____.
***Before moving out, you must give our representative advance written move-out notice as stated in Par. 36.*** The move-out date in your notice [**check one**]: ☒ must be the last day of the month, or ☐ may be the exact day designated in your notice. If neither option is checked here, the second applies. Any resident, occupant, or spouse who, according to a remaining resident's affidavit, has permanently moved out or is under court order not to enter the apartment, is (at our option) no longer entitled to occupancy, keys, or other access devices, unless authorized by court order. Your apartment will be [**check one**]: ☐ furnished *or* ☒ unfurnished.

6. **Rent and Charges.** You will pay $ 750.00 per month for rent, in advance and without demand [**check one**]:
   - ☒ at the onsite manager's office
   - ☐ through our online payment site
   - ☒ at 2011 Bandera Rd.

   Prorated rent of $____ is due for the remainder of the [**check one**]: ☐ 1st month *or* ☐ 2nd month, on the ____ day of ____ (month), ____ (year). ***You must pay your rent on or before the 1st day of each month (due date). There is no grace period, and you agree that not paying rent on the 1st of each month is a material breach of this Lease. Cash is not acceptable without our prior written permission. You cannot withhold or offset rent unless authorized by law.*** We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks. You agree that if you don't pay all rent on or before the 5th day of the month, you'll pay the reasonable initial late charge of $ 50.00, plus the reasonable daily late charge of $ 5.00 per day after that date until the amount due is paid in full. Daily late charges cannot exceed 15 days for any single month's rent. We won't impose late charges until at least the third day of the month. You'll also pay a charge of $ 25.00 for each returned check or rejected electronic payment, plus initial and daily late charges, until we receive acceptable payment. If you don't pay rent on time, you'll be in default and subject to all remedies under state law and this Lease. If you violate the animal restrictions of Par. 27 or other animal rules, you'll pay an initial charge of $ 150.00 per animal (not to exceed $100 per animal) and a daily charge of $ 100.00 per animal (not to exceed $10 per day per animal) from the date the animal was brought into your apartment until it is removed. We'll also have all other remedies for such violations.

7. **Utilities and Services.** We'll pay for the following items, if checked: ☒ gas ☐ water ☐ wastewater ☐ electricity ☒ trash/recycling ☐ cable/satellite ☐ master antenna ☐ Internet ☐ stormwater/drainage ☐ other ____
You'll pay for all other utilities and services, related deposits, and any charges or fees on such utilities and services during your Lease term. See Par. 12 for other related provisions regarding utilities and services.

8. **Insurance.** ***Our insurance doesn't cover the loss of or damage to your personal property.*** You are [**check one**]:
   - ☐ required to buy and maintain renter's or liability insurance (see attached addendum), *or*
   - ☒ not required to buy renter's or liability insurance.

   ***If neither option is checked, insurance is not required but is still strongly recommended. Even if not required, we urge you to get your own insurance for losses due to theft, fire, water, pipe leaks, and similar occurrences.*** Renter's insurance doesn't cover losses due to a flood. Information on renter's insurance is available from the Texas Department of Insurance.

9. **Special Provisions.** The following or attached special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease and will supersede any conflicting provisions of this printed Lease form.
Rent is due on the 5th of each month on the 6th it is late with a $50 Late Fee and $5 a day. Water, Trash, Pest Control and Gas is a utility amount that is due on the 10th of each month. Refrigerator and stove will be provided by owner.

10. **Unlawful Early Move-Out And Reletting Charge.**
10.1 **Your Responsibility.** You'll be liable for a reletting charge of $____ (not to exceed 85% of the highest monthly rent during the Lease term) if you: (A) fail to move in, or fail to give written move-out notice as required in Par. 23 or 36; (B) move out without paying rent in full for the entire Lease term or renewal period; (C) move out at our demand because of your default; or (D) are judicially evicted. ***The reletting charge is not a cancellation fee and does not release you from your obligations under this Lease. See the next section.***

**10.2 Not a Release.** The reletting charge is neither a Lease cancellation nor a buyout fee. It is a liquidated amount covering only part of our damages—for our time, effort, and expense in finding and processing a replacement resident. These damages are uncertain and hard to ascertain—particularly those relating to inconvenience, paperwork, advertising, showing apartments, utilities for showing, checking prospects, overhead, marketing costs, and locator-service fees. You agree that the reletting charge is a reasonable estimate of our damages and that the charge is due whether or not our reletting attempts succeed. If no amount is stipulated, you must pay our actual reletting costs as far as they can be determined. The reletting charge doesn't release you from continued liability for future or past-due rent; charges for cleaning, repairing, repainting, or dealing with unreturned keys; or other sums due.

**11. Security Devices.**

**11.1 What We Provide.** ***Texas Property Code secs. 92.151, 92.153, and 92.154 require, with some exceptions, that we provide at no cost to you when occupancy begins: (A) a window latch on each window; (B) a doorviewer (peephole) on each exterior door; (C) a pin lock on each sliding door; (D) either a door-handle latch or a security bar on each sliding door; (E) a keyless bolting device (deadbolt) on each exterior door; and (F) either a keyed doorknob lock or a keyed deadbolt lock on one entry door. Keyed locks will be rekeyed after the prior resident moves out. The rekeying will be done either before you move in or within 7 days after you move in, as required by law. If we fail to install or rekey security devices as required by law, you have the right to do so and deduct the reasonable cost from your next rent payment under Texas Property Code sec. 92.165(1). We may deactivate or not install keyless bolting devices on your doors if (A) you or an occupant in the dwelling is over 55 or disabled, and (B) the requirements of Texas Property Code sec. 92.153(e) or (f) are satisfied.***

**11.2 Who Pays What.** We'll pay for missing security devices that are required by law. ***You'll pay for: (A) rekeying that you request (unless we failed to rekey after the previous resident moved out); and (B) repairs or replacements because of misuse or damage by you or your family, your occupants, or your guests.*** You must pay immediately after the work is done unless state law authorizes advance payment. You must also pay in advance for any additional or changed security devices you request.

**12. Other Utilities and Services.** Television channels that are provided may be changed during the Lease term if the change applies to all residents. You may use utilities only for normal household purposes and must not waste them. If your electricity is interrupted, you must use only battery-operated lighting (no flames). You must not allow any utilities (other than cable or Internet) to be cut off or switched for any reason—including disconnection for not paying your bills—until the Lease term or renewal period ends. If a utility is submetered or prorated by an allocation formula, we'll attach an addendum to this Lease in compliance with state-agency rules. If a utility is individually metered, it must be connected in your name and you must notify the provider of your move-out date so the meter can be timely read. If you delay getting it turned on in your name by the Lease's start date or cause it to be transferred back into our name before you surrender or abandon the apartment, you'll be liable for a $ 50.00 charge (not to exceed $50 per violation), plus the actual or estimated cost of the utilities used while the utility should have been connected in your name. If you're in an area open to competition and your apartment is individually metered, you may choose or change your retail electric provider at any time. If you qualify, your provider will be the same as ours, unless you choose a different provider. If you do choose or change your provider, you must give us written notice. You must pay all applicable provider fees, including any fees to change service back into our name after you move out.

## Special Provisions and "What If" Clauses

**13. Damages and Reimbursement.**

**13.1 Damage in the Apartment Community.** You must promptly pay or reimburse us for loss, damage, consequential damages, government fines or charges, or cost of repairs or service in the apartment community because of a Lease or rules violation; improper use; negligence; other conduct by you, your invitees, your occupants, or your guests; or any other cause not due to our negligence or fault as allowed by law, except for damages by acts of God to the extent they couldn't be mitigated by your action or inaction.

**13.2 Indemnification by You.** ***You'll defend, indemnify and hold us harmless from all liability arising from your conduct or that of your invitees, your occupants, your guests, or our representatives who at your request perform services not contemplated in this Lease.***

**13.3 Damage and Wastewater Stoppage.** ***Unless damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacements, and damage of the following kind if occurring during the Lease term or renewal period: (A) damage to doors, windows, or screens; (B) damage from windows or doors left open; and (C) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment.***

**13.4 No Waiver.** We may require payment at any time, including advance payment to repair damage that you are liable for. Delay in demanding sums you owe is not a waiver.

**14. Contractual Lien and Property Left in Apartment.**

**14.1 Lien Against Your Property for Rent.** ***All property in the apartment (unless exempt under Texas Property Code sec. 54.042) is subject to a contractual lien to secure payment of delinquent rent (except as prohibited by Texas Government Code sec. 2306.6738, for owners supported by housing-tax-credit allocations).*** For this purpose, "apartment" excludes common areas but includes the interior living areas and exterior patios, balconies, attached garages, and any storerooms for your exclusive use.

**14.2 Removal After We Exercise Lien for Rent.** ***If your rent is delinquent, our representative may peacefully enter the apartment, and remove and/or store all property subject to lien.*** All property in the apartment is presumed to be yours unless proved otherwise. After the property is removed, a written notice of entry must be left in a conspicuous place in the apartment—including a list of items removed, the amount of delinquent rent due, and the name, address, and phone number of the person to contact. The notice must also state that the property will be promptly returned when the delinquent rent is fully paid.

**14.3 Removal After Surrender, Abandonment, or Eviction.** We, or law officers, may remove or store all property remaining in the apartment or in common areas (including any vehicles you or any occupant or guest owns or uses) if you're judicially evicted or if you surrender or abandon the apartment (see definitions in Par. 41).

**14.4 Storage.**

**(A)** ***No duty.*** We'll store property removed under a contractual lien. We may—but we have no duty to—store property removed after judicial eviction, surrender, or abandonment of the apartment.

**(B)** ***No liability.*** We're not liable for casualty, loss, damage, or theft, except for property removed under a contractual lien.

**(C)** ***Charges you pay.*** You must pay reasonable charges for our packing, removing, storing, and selling of any property.

**(D)** ***Our lien.*** We have a lien on all property removed and stored after surrender, abandonment, or judicial eviction for all sums you owe, with one exception: our lien on property listed under Texas Property Code sec. 54.042 is limited to charges for packing, removing, and storing.

**14.5 Redemption.**

**(A)** ***Property on which we have a lien.*** If we've seized and stored property under a contractual lien for rent as authorized by law, you may redeem the property by paying all delinquent rent due at the time of seizure. But if notice of sale (see Par. 14.6(C)) is given before you seek redemption, you may redeem only by paying the delinquent rent plus our reasonable charges for packing, removing, and storing.

**(B)** ***Property removed after surrender, abandonment, or judicial eviction.*** If we've removed and stored property after surrender, abandonment, or judicial eviction, you may redeem only by paying all sums you owe, including rent, late charges, reletting charges, storage charges, damages, etc.

**(C)** ***Place and payment for return.*** We may return redeemed property at the place of storage, the management office, or the apartment (at our option). We may require payment by cash, money order, or certified check.

**14.6 Disposition or Sale.**

**(A)** ***Our options.*** Except for animals and property removed after the death of a sole resident, we may throw away or give to a charitable organization all personal property that is:

(1) left in the apartment after surrender or abandonment; *or*
(2) left outside more than 1 hour after writ of possession is executed, following judicial eviction.

(B) ***Animals.*** An animal removed after surrender, abandonment, or eviction may be kenneled or turned over to a local authority, humane society, or rescue organization.

(C) ***Sale of property.*** Property not thrown away or given to charity may be disposed of only by sale, which must be held no sooner than 30 days after written notice of the date, time, and place of sale is sent by both regular mail and certified mail (return receipt requested) to your last known address. The notice must itemize the amounts you owe and provide the name, address, and phone number of the person to contact about the sale, the amount owed, and your right to redeem the property. The sale may be public or private; is subject to any third-party ownership or lien claims; must be to the highest cash bidder; and may be in bulk, in batches, or item-by-item. If the proceeds from the sale are more than you owe, the excess amount must be mailed to you at your last known address within 30 days after sale.

**15. Failing to Pay First Month's Rent.** If you don't pay the first month's rent when or before the Lease begins, all future rent for the Lease term will be automatically accelerated without notice and become immediately due. We also may end your right of occupancy and recover damages, future rent, reletting charges, attorney's fees, court costs, and other lawful charges. Our rights, remedies and duties under Par. 10 and 32 apply to acceleration under this paragraph.

**16. Rent Increases and Lease Changes.** No rent increases or Lease changes are allowed before the initial Lease term ends, except for those allowed by special provisions in Par. 9, by a written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under Par. 19. If, at least 5 days before the advance-notice deadline referred to in Par. 3, we give you written notice of rent increases or Lease changes that become effective when the Lease term or renewal period ends, this Lease will automatically continue month-to-month with the increased rent or Lease changes. The new modified Lease will begin on the date stated in the notice (without needing your signature) unless you give us written move-out notice under Par. 36. The written move-out notice under Par. 36 applies only to the end of the current Lease or renewal period.

**17. Delay of Occupancy.**

**17.1 Lease Remains in Force.** We are not responsible for any delay of your occupancy caused by construction, repairs, cleaning, or a previous resident's holding over. This Lease will remain in force subject to:
(A) abatement of rent on a daily basis during delay, *and*
(B) your right to terminate the lease in writing as set forth below.

**17.2 Your Termination Rights.** Termination notice must be in writing. After termination, you are entitled only to refund of any deposit(s) and any rent you paid. Rent abatement or Lease termination does not apply if the delay is for cleaning or repairs that don't prevent you from moving into the apartment.

**17.3 Notice of Delay.** If there is a delay of your occupancy and we haven't given notice of delay as set forth immediately below, you may terminate this Lease up to the date when the apartment is ready for occupancy, but not later.
(a) If we give written notice to any of you or your occupants when or after the Lease begins—and the notice states that occupancy has been delayed because of construction or a previous resident's holding over, and that the apartment will be ready on a specific date—you may terminate the Lease within 3 days after you receive written notice, but no later.
(b) If we give any of you written notice before the date the Lease begins and the notice states that a construction delay is expected and that the apartment will be ready for you to occupy on a specific date, you may terminate the Lease within 7 days after receiving written notice, but no later. The readiness date stated in the written notice becomes the new effective Lease date for all purposes. This new date can't be moved to an earlier date unless we and you agree in writing.

**18. Disclosure of Information.** If someone requests information about you or your rental history for law-enforcement, governmental, or business purposes, we may provide it. At our request, any utility provider may give us information about pending or actual connections or disconnections of utility service to your apartment.

## While You're Living in the Apartment

**19. Community Policies and Rules.**

**19.1 Generally.** Our rules are considered part of this Lease. You, your occupants, and your guests must comply with all written apartment rules and community policies, including instructions for care of our property. We may regulate: (A) the use of patios, balconies, and porches; (B) the conduct of furniture movers and delivery persons; and (C) activities in common areas. We may make reasonable changes to written rules, and those rules can become effective immediately if the rules are distributed and applicable to all units in the apartment community and do not change the dollar amounts on pages 1 or 2 of this Lease.

**19.2 Some Specifics.** Your apartment and other areas reserved for your private use must be kept clean. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. You will use balconies with care and will not overload them. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care and in accordance with apartment rules and posted signs.

**19.3 Limitations on Conduct.** Glass containers are prohibited in or near pools and all other common areas. Within the apartment community, you, your occupants, and your guests must not use candles or kerosene lamps or heaters without our prior written approval, or cook on balconies or outside. You, your occupants, and your guests must not solicit business or contributions. Conducting any kind of business (including child-care services) in your apartment or in the apartment community is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes.

**19.4 Exclusion of Persons.** We may exclude from the apartment community any guests or others who, in our judgment, have been violating the law, violating this Lease or our rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area anyone who refuses to show photo identification or refuses to identify himself or herself as a resident, an occupant, or a guest of a specific resident in the community.

**19.5 Notice of Convictions and Registration.** You must notify us within 15 days if you or any of your occupants are convicted of (A) any felony, or (B) any misdemeanor involving a controlled substance, violence to another person, or destruction of property. You must also notify us within 15 days if you or any of your occupants register as a sex offender. Informing us of a criminal conviction or sex-offender registration doesn't waive any rights we may have against you.

**20. Prohibited Conduct.** You, your occupants, and your guests may not engage in the following activities:
(a) criminal conduct; manufacturing, delivering, or possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; or, except when allowed by law, displaying or possessing a gun, knife, or other weapon in the common area, or in a way that may alarm others;
(b) behaving in a loud or obnoxious manner;
(c) disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community;
(d) disrupting our business operations;
(e) storing anything in closets containing gas appliances;
(f) tampering with utilities or telecommunications;
(g) bringing hazardous materials into the apartment community;
(h) using windows for entry or exit;
(i) heating the apartment with a gas-operated cooking stove or oven; *or*
(j) injuring our reputation by making bad-faith allegations against us to others.

**21. Parking.** We may regulate the time, manner, and place of parking all cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles. Motorcycles or motorized bikes must not be parked inside an apartment, on sidewalks, under stairwells, or in handicapped-parking areas. We may have any unauthorized or illegally parked vehicles towed or booted according to state law at the owner or operator's expense at any time if the vehicle:
(a) has a flat tire or is otherwise inoperable;
(b) is on jacks, on blocks, or has a wheel missing;
(c) takes up more than one parking space;

(d) belongs to a resident or occupant who has surrendered or abandoned the apartment;
(e) is in a handicapped space without the legally required handicapped insignia;
(f) is in a space marked for office visitors, managers, or staff;
(g) blocks another vehicle from exiting;
(h) is in a fire lane or designated "no parking" area;
(i) is in a space marked for another resident or apartment;
(j) is on the grass, sidewalk, or patio;
(k) blocks a garbage truck from access to a dumpster;
(l) has no current license or registration, and we have given you at least 10 days' notice that the vehicle will be towed if not removed; *or*
(m) is not moved to allow parking lot maintenance.

**22. Release of Resident.**

**22.1 Generally.** ***You may have the right under Texas law to terminate the Lease early in certain situations involving family violence, certain sexual offenses, or stalking.*** Otherwise, unless you're entitled to terminate this Lease under Par. 9, 17, 23, 31, or 36, you won't be released from this Lease for any reason—including voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of coresidents, loss of employment, bad health, property purchase, or death.

**22.2 Death of Sole Resident.** If you are the sole resident and die during the Lease term, an authorized representative of your estate may terminate the Lease without penalty by giving at least 30 days' written notice. Your estate will be liable for paying rent until the latter of: (A) the termination date or (B) removal of all possessions in the apartment. Your estate will also be liable for all charges and damages until the apartment is vacated, and any removal or storage costs.

**23. Military Personnel.**

**23.1 Termination Rights.** ***You may have the right under Texas law to terminate the Lease in certain situations involving military deployment or transfer.*** You may terminate the Lease if you enlist, are drafted into, or are commissioned in the U.S. Armed Forces. You also may terminate the Lease if:
(a) you are (1) a member of the U.S. Armed Forces or Reserves on active duty, or (2) a member of the National Guard called to active duty for more than 30 days in response to a national emergency declared by the President; *and*
(b) you (1) receive orders for a permanent change of station, (2) receive orders to deploy with a military unit or as an individual in support of a military operation for 90 days or more, or (3) are relieved or released from active duty.

**23.2 How to Terminate Under This Par. 23.** You must furnish us a copy of your military orders, such as permanent-change-of-station orders, call-up orders, or deployment orders (or letter equivalent). Military permission for base housing doesn't constitute a permanent-change-of-station order. You must deliver to us your written termination notice, after which the Lease will be terminated under this military clause 30 days after the date your next rental payment is due. After your move-out, we'll return your security deposit, less lawful deductions.

**23.3 Who May Be Released.** For the purposes of this Lease, orders described in (b) under Par. 23.1 above will release only the resident who qualifies under both (a) and (b) above and receives the orders during the Lease term, plus that resident's spouse or legal dependents living in the resident's household. A coresident who is not the spouse or dependent of a military resident cannot terminate under this military clause.

**23.4 Your Representations.** Unless you state otherwise in Par. 9, you represent when signing this Lease that:
(a) you do not already have deployment or change-of-station orders;
(b) you will not be retiring from the military during the Lease term; *and*
(c) the term of your enlistment or obligation will not end before the Lease term ends.

You must notify us immediately if you are called to active duty or receive deployment or permanent-change-of-station orders.

**23.5 Damages for False Representations.** Liquidated damages for making a false representation of the above will be the amount of unpaid rent for the remainder of the Lease term when and if you move out, minus rents from others received in mitigation under Par. 32.6.

**24. Resident Safety and Loss.**

**24.1 Disclaimer.** ***We disclaim any express or implied warranties of security.*** We care about your safety and that of other occupants and guests. You agree to make every effort to follow any Security Guidelines Addendum attached to this Lease. ***No security system is failsafe. Even the best system can't prevent crime. Always act as if security systems don't exist since they are subject to malfunction, tampering, and human error. The best safety measures are the ones you take as a matter of common sense and habit.***

**24.2 Your Duty of Due Care.** You, your occupants, and your guests must exercise due care for your own and others' safety and security, especially in using smoke alarms and other detection devices, door and window locks, and other safety or security devices. Window screens are not for security or to keep people from falling out of windows.

**24.3 Alarm and Detection Devices.**
(A) ***What we'll do.*** We'll furnish smoke alarms or other detection devices required by law or city ordinance. We may install additional detectors not so required. We'll test them and provide working batteries when you first take possession of your apartment. Upon request, we'll provide, as required by law, a smoke alarm capable of alerting a person with a hearing-impairment disability.
(B) ***Your duties.*** You must pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report alarm or detector malfunctions to us. Neither you nor others may disable alarms or detectors. ***If you damage or disable the smoke alarm, or remove a battery without replacing it with a working battery, you may be liable to us under Texas Property Code sec. 92.2611 for $100 plus one month's rent, actual damages, and attorney's fees.*** You'll be liable to us and others if you fail to report malfunctions, or fail to report any loss, damage, or fines resulting from fire, smoke, or water.

**24.4 Loss.** Unless otherwise required by law, we're not liable to any resident, guest, or occupant for personal injury or damage, loss of personal property, or loss of business or personal income, from any cause, including fire, smoke, rain, flood, water leaks, hail, ice, snow, lightning, wind, explosions, interruption of utilities, pipe leaks, theft, vandalism, and negligent or intentional acts of residents, occupants, or guests. We have no duty to remove any ice, sleet, or snow but may remove any amount with or without notice. Unless we instruct otherwise, during freezing weather you must for 24 hours a day: (A) keep the apartment heated to at least 50° Fahrenheit, (B) keep cabinet and closet doors open, and (C) drip hot- and cold-water faucets. You'll be liable for any damage to our and others' property caused by broken water pipes due to your violating these requirements.

**24.5 Crime or Emergency.** Immediately dial 911 or call local medical-emergency, fire, or police personnel in case of accident, fire, smoke, suspected criminal activity, or any other emergency involving imminent harm. You should then contact our representative. None of our security measures are an express or implied warranty of security—or a guarantee against crime or of reduced risk of crime. Unless otherwise provided by law, we're not liable to you, your occupants, or your guests for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. Even if previously provided, we're not obliged to furnish security personnel, patrols, lighting, gates, fences, or other forms of security unless required by law. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you, your occupants, or your guests are affected by a crime, you must make a written report to the appropriate local law-enforcement agency and to our representative. You must also give us the law-enforcement agency's incident-report number upon request.

**25. Condition of the Premises and Alterations.**

**25.1 As-Is.** ***We disclaim all implied warranties.*** You accept the apartment, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. You'll be given an Inventory & Condition form on or before move-in. Within 48 hours after move-in, you must note on the form all defects or damage, sign the form, and return it to us. Otherwise, everything will be considered to be in a clean, safe, and good working condition.

**25.2 Standards and Improvements.** You must use customary diligence in maintaining the apartment and not damaging

Your Initials:  Initials of Our Representative: ______

or littering the common areas. Unless authorized by law or by us in writing, you must not do any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. Unless our rules state otherwise, we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and grooves of wood-paneled walls. No water furniture, washing machines, extra phone or television outlets, alarm systems, or lock changes, additions, or rekeying is permitted unless allowed by law or we've consented in writing. You may install a satellite dish or antenna, but only if you sign our satellite-dish or antenna lease addendum, which complies with reasonable restrictions allowed by federal law. You must not alter, damage, or remove our property, including alarm systems, detection devices, furniture, telephone and television wiring, screens, locks, and security devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (made with or without our consent) become ours unless we agree otherwise in writing.

**25.3 Fair Housing.** We are committed to the principles of fair housing. In accordance with fair-housing laws, we'll make reasonable accommodations to our rules, policies, practices, or services. We'll allow reasonable modifications under these laws to give disabled persons access to and use of this apartment community. We may require you to sign an addendum regarding the implementation of any accommodations or modifications, as well as your restoration obligations, if any.

**26. Requests, Repairs, and Malfunctions.**

**26.1 Written Requests Required.** ***If you or any occupant needs to send a notice or request—for example, for repairs, installations, services, ownership disclosure, or security-related matters—it must be written, signed, and delivered to our designated representative*** (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, crime in progress, or fair-housing accommodation or modification). Our written notes on your oral request do not constitute a written request from you. Our complying with or responding to any oral request regarding security or any other matter doesn't waive the strict requirement for written notices under this Lease.

**26.2 Required Notifications.** You must promptly notify us in writing of water leaks, mold, electrical problems, malfunctioning lights, broken or missing locks or latches, and other conditions that pose a hazard to property, health, or safety.

**26.3 Utilities.** We may change or install utility lines or equipment serving the apartment if the work is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately.

**26.4 Air-Conditioning and Other Equipment.** Air-conditioning problems are normally not emergencies. If air-conditioning or other equipment malfunctions, you must notify us as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections, taking into consideration when casualty-insurance proceeds are received. Your rent will not abate in whole or in part.

**26.5 Our Right to Terminate.** If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate this Lease by giving you at least 5 days' written notice. We also have the right to terminate this Lease during the Lease term by giving you at least 30 days' written notice of termination if we are demolishing your apartment or closing it and it will no longer be used for residential purposes for at least 6 months. If the Lease is so terminated, we'll refund prorated rent and all deposits, less lawful deductions. We may also remove personal property if it causes a health or safety hazard.

**27. Animals.**

**27.1 No Animals Without Consent.** ***No animals (including mammals, reptiles, birds, fish, rodents, amphibians, arachnids, and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless we've given written permission.*** If we allow an animal, you must sign a separate animal addendum and, except as set forth in the addendum, pay an animal deposit. An animal deposit is considered a general security deposit. The animal addendum includes information governing animals, including assistance or service animals. We'll authorize an assistance or support animal for a disabled person without requiring an animal deposit. We may require verification of your disability and the need for such an animal. You must not feed stray or wild animals.

**27.2 Violations of Animal Policies.**

**(A)** ***Charges for violations.*** If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for all cleaning and repair costs, including defleaing, deodorizing, and shampooing. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except attorney's fees and litigation costs) in enforcing animal restrictions and rules.

**(B)** ***Removal and return of animal.*** We may remove an unauthorized animal by (1) leaving, in a conspicuous place in the apartment, a written notice of our intent to remove the animal within 24 hours; and (2) following the procedures of Par. 28. We may keep or kennel the animal, or turn it over to a humane society, local authority or rescue organization. When keeping or kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. You must pay for the animal's reasonable care and kenneling charges. We'll return the animal to you upon request if it has not already been turned over to a humane society, local authority or rescue organization. We have no lien on the animal for any purpose.

**28. When We May Enter.** If you or any guest or occupant is present, then repairers, servicers, contractors, government representatives, lenders, appraisers, prospective residents or buyers, insurance agents, persons authorized to enter under your rental application, or our representatives may peacefully enter the apartment at reasonable times for reasonable business purposes. If nobody is in the apartment, then any such person may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary) for reasonable business purposes if written notice of the entry is left in a conspicuous place in the apartment immediately after the entry. Law officers with a search or arrest warrant or those in hot pursuit may be allowed to enter.

**29. Multiple Residents.** Each resident is jointly and severally liable for all Lease obligations. If you or any guest or occupant violates the Lease or rules, all residents are considered to have violated the Lease. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant constitute notice from all residents. Your notice of Lease termination may be given only by a resident. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Any resident who defaults under this Lease will indemnify the nondefaulting residents and their guarantors.

## Replacements

**30. Replacements and Subletting.**

**30.1 When Allowed.** Replacing a resident, subletting, or assigning a resident's rights is allowed ***only when we consent in writing.*** If a departing or remaining resident finds a replacement resident acceptable to us before moving out and we expressly consent to the replacement, subletting, or assignment, then:

(a) a reletting charge will not be due;

(b) a reasonable administrative (paperwork) fee will be due; and a rekeying fee will be due if rekeying is requested or required; ***and***

(c) the departing and remaining residents will remain liable for all Lease obligations for the rest of the original Lease term.

**30.2 Procedures for Replacement.** If we approve a replacement resident, then, at our option: (A) the replacement resident must sign this Lease with or without an increase in the total security deposit; or (B) the remaining and replacement residents must sign an entirely new Lease. Unless we agree otherwise in writing, the departing resident's security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right to occupancy or to a security-deposit refund, but will remain liable for the remainder of the original Lease term unless we agree otherwise in writing—even if a new Lease is signed.

**30.3 Rental Prohibited.** You agree that you won't rent or offer to rent all or any part of your apartment to anyone else. You agree that you won't accept anything of value from anyone else for the use of any part of your apartment. You agree not to list any part of your apartment on any lodging rental website or with any service that advertises dwellings for rent.

## Responsibilities of Owner and Resident

**31. Our Responsibilities.**

**31.1 Generally.** We'll act with customary diligence to:
(a) keep common areas reasonably clean, subject to Par. 25;
(b) maintain fixtures, hot water, heating, and air-conditioning equipment;
(c) substantially comply with all applicable laws regarding safety, sanitation, and fair housing; *and*
(d) make all reasonable repairs, subject to your obligation to pay for damages for which you're liable.

**31.2 Your Remedies.** ***If we violate any of the above, you may possibly terminate this Lease and exercise other remedies under Texas Property Code Sec. 92.056 by following this procedure:***
(a) all rent must be current, and you must make a written request for repair or remedy of the condition—after which we'll have a reasonable time for repair or remedy;
(b) If we fail to do so, you must make a second written request for the repair or remedy (to make sure that there has been no miscommunication between us)—after which we'll have a reasonable time to repair or remedy; *and*
(c) If the repair or remedy still hasn't been accomplished within that reasonable time period, you may immediately terminate this Lease by giving us a final written notice.
***You also may exercise other statutory remedies, including those under Texas Property Code sec. 92.0561.***

**31.3 Request by Mail.** Instead of giving the two written requests referred to above, you may give us one request by certified mail, return receipt requested, by registered mail, or by any trackable mail or delivery method through the postal service or a private delivery service—after which we'll have a reasonable time to repair or remedy. "Reasonable time" accounts for the nature of the problem and the reasonable availability of materials, labor, and utilities. Your rent must be current when you make any request. We'll refund security deposits and prorated rent as required by law.

**32. Default by Resident.**

**32.1 Acts of Default.** You'll be in default if: (A) you don't timely pay rent or other amounts you owe; (B) you or any guest or occupant violates this Lease, apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (C) you abandon the apartment; (D) you give incorrect or false answers in a rental application; (E) you or any occupant is arrested, charged, detained, convicted, or given deferred adjudication or pretrial diversion for (1) a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia as defined in the Texas Controlled Substances Act, or (2) any sex-related crime, including a misdemeanor; (F) you are found to have any illegal drugs or paraphernalia in your apartment; or (G) you or any occupant, in bad faith, makes an invalid habitability complaint to an official or employee of a utility company or the government.

**32.2 Eviction.** ***If you default or hold over, we may end your right of occupancy by giving you at least a 24-hour written notice to vacate.*** Notice may be given by: (A) regular mail; (B) certified mail, return receipt requested; (C) personal delivery to any resident; (D) personal delivery at the apartment to any occupant over 16 years old; (E) affixing the notice to the inside of the apartment's main entry door; or (F) securely affixing the notice to the outside of the apartment's main entry door as allowed by law. Notice by mail under (A) or (B) will be considered delivered on the earlier of actual delivery, or 3 days (not counting Sundays or federal holidays) after the notice is deposited in the U.S. Postal Service with postage. Termination of your possession rights or a later reletting doesn't release you from liability for future rent or other Lease obligations. ***After giving notice to vacate or filing an eviction suit, we may still accept rent or other sums due;*** the filing or acceptance doesn't waive or diminish our right of eviction or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages, to past or future rent or other sums, or to our continuing with eviction proceedings. ***In an eviction, rent is owed for the full rental period and will not be prorated.***

**32.3 Acceleration.** Unless we elect not to accelerate rent, all monthly rent for the rest of the Lease term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without our written consent: (A) you move out, remove property in preparing to move out, or you or any occupant gives oral or written notice of intent to move out before the Lease term or renewal period ends; and (B) you haven't paid all rent for the entire Lease term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent will also be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations below.

**32.4 Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by the parties in writing). If a holdover occurs, then (A) holdover rent is due in advance on a daily basis and may become delinquent without notice or demand; (B) rent for the holdover period will be increased by 25% over the then-existing rent, without notice; (C) you'll be liable to us (subject to our mitigation duties) for all rent for the full term of the previously signed Lease of a new resident who can't occupy because of the holdover; and (D) at our option, we may extend the Lease term—for up to one month from the date of notice of Lease extension—by delivering written notice to you or your apartment while you continue to hold over.

**32.5 Other Remedies.** We may report unpaid amounts to credit agencies as allowed by law. If we or a third-party debt collector we use tries to collect any money you owe us, you agree that we or the debt collector may call you on your cellphone and may use an automated dialer. If you default, you will pay us, in addition to other sums due, any amounts stated to be rental discounts or concessions agreed to in writing. Upon your default, we have all other legal remedies, including Lease termination and statutory lockout under Texas Property Code sec. 92.0081, ***except as lockouts and liens are prohibited by Texas Government Code sec. 2306.6738 for owners supported by housing-tax-credit allocations.*** A prevailing party may recover reasonable attorney's fees and all other litigation costs from the nonprevailing parties, except a party may not recover attorney's fees and litigation costs in connection with a party's claims seeking personal-injury, sentimental, exemplary or punitive damages. We may recover attorney's fees in connection with enforcing our rights under this Lease. You agree that late charges are liquidated damages representing a reasonable estimate of the value of our time, inconvenience, and overhead associated with collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts you owe, including judgments, bear 18% interest per year from the due date, compounded annually. You must pay all collection-agency fees if you fail to pay sums due within 10 days after we mail you a letter demanding payment and stating that collection-agency fees will be added if you don't pay all sums by that deadline.

**32.6 Mitigation of Damages.** If you move out early, you'll be subject to Par. 10 and all other remedies. We'll exercise customary diligence to relet and minimize damages. We'll credit all later rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

## General Clauses

**33. Other Important Provisions.**

**33.1 Representatives' Authority; Waivers; Notice.** ***Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease or any part of it unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives, unless in writing.*** Any dimensions and sizes provided to you relating to the apartment are only approximations or estimates; actual dimensions and sizes may vary. No action or omission by us will be considered a waiver of our rights or of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, liens, or other rights isn't a waiver under any circumstances. Except when notice or demand is required by law, you waive any notice and demand for performance from us if you default. If anyone else has guaranteed performance of this Lease, a separate Lease Guaranty for each guarantor must be executed. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease should keep a copy of the memo, letter, or fax that was given (and any fax-transmittal verification). Fax or electronic signatures are binding. All notices must be signed. Unless this lease or the law requires otherwise, any notice required to be provided, sent or delivered in writing may be given electronically, subject to our rules.

**33.2 Miscellaneous.** All remedies are cumulative. Exercising one remedy won't constitute an election or waiver of other remedies. All provisions regarding our nonliability or nonduty apply to our employees, agents, and management companies. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf. This Lease binds subsequent owners. This Lease is subordinate to existing and future recorded mortgages, unless the owner's lender chooses otherwise. All Lease obligations must be performed in the county where the apartment is located. Neither an invalid clause nor the omission of initials on any page invalidates this Lease. If you have insurance covering the apartment or your personal belongings at the time you or we suffer or allege a loss, you and we agree to waive any insurance subrogation rights. All notices and documents may be in English and, at our option, in any other language that you read or speak. The term "including" in this Lease should be interpeted to mean "including but not limited to."

**34. Payments.** Payment of each sum due is an independent covenant. When we receive money, other than sale proceeds under Par. 14 or utility payments subject to government regulation, we may apply it at our option and without notice first to any of your unpaid obligations, then to current rent. We may do so regardless of notations on checks or money orders and regardless of when the obligations arose. All sums other than rent are due upon our demand. After the due date, we do not have to accept any payments.

**35. TAA Membership.** We represent that, at the time of signing this Lease, we, the management company representing us, or any locator service that procured you is a member in good standing of both the Texas Apartment Association and the affiliated local apartment association for the area where the apartment is located. The member is either an owner/management-company member or an associate member doing business as a locator service (whose name and address must be disclosed on page 8). If not, the following applies: (A) this Lease is voidable at your option and is unenforceable by us (except for property damages); and (B) we may not recover past or future rent or other charges. The above remedies also apply if both of the following occur: (1) the Lease is automatically renewed on a month-to-month basis more than once after membership in TAA and the local association has lapsed; and (2) neither the owner nor the management company is a member of TAA and the local association during the third automatic renewal. A signed affidavit from the affiliated local apartment association attesting to nonmembership when the Lease or renewal was signed will be conclusive evidence of nonmembership. Governmental entities may use TAA forms if TAA agrees in writing.

## When Moving Out

**36. Move-Out Notice.**

**36.1 Requirements and Compliance.** Your move-out notice doesn't release you from liability for the full term of the Lease or renewal term. You'll still be liable for the entire Lease term if you move out early except under Par. 9, 17, 22, 23, or 31. ***Your move-out notice must comply with each of the following:***

(a) We must receive advance written notice of your move-out date. You must give notice in advance by at least the number of days required in Par. 3 or in special provisions—even if the Lease has become a month-to-month lease. Unless we require more than 30 days' notice, if you give notice on the first day of the month you intend to move out, it will suffice for move-out on the last day of that month, as long as all other requirements below are met.

(b) Your move-out notice must be in writing. An oral move-out notice will not be accepted and will not terminate your Lease.

(c) Your move-out notice must not terminate the Lease sooner than the end of the Lease term or renewal period.

(d) If we require you to give us more than 30 days' written notice to move out before the end of the Lease term, we will give you 1 written reminder not less than 5 days nor more than 90 days before your deadline for giving us your written move-out notice. If we fail to give a reminder notice, 30 days' written notice to move-out is required.

**36.2 Unacceptable Notice.** ***Your notice is not acceptable if it doesn't comply with all of the above.*** We recommend that you use our written move-out form to ensure that you provide all the information needed. You must get from us a written acknowledgment of your notice. If we fail to give a reminder notice, 30 days' written notice to move out is required. If we terminate the Lease, we must give you the same advance notice—unless you are in default.

**37. Move-Out Procedures.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the Lease term or renewal period ends unless all rent for the entire Lease term or renewal period is paid in full. Early move-out may result in reletting charges and acceleration of future rent under Par. 10 and 32. You're prohibited by law from applying any security deposit to rent. You can't stay beyond the date you're supposed to move out. All residents, guests, and occupants must surrender or abandon the apartment before the 30-day period for deposit refund begins. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**38. Cleaning.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges—including charges for cleaning carpets, draperies, furniture, walls, etc. that are soiled beyond normal wear (that is, wear or soiling that occurs without negligence, carelessness, accident, or abuse).

**39. Move-Out Inspection.** You should meet with our representative for a move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final accounting or refunding.

**40. Security Deposit Deductions and Other Charges.** You'll be liable for the following charges, if applicable: unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing; replacing dead or missing alarm or detection-device batteries at any time; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone, Internet, television services, or rental items (if you so request or have moved out); trips to open the apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized security devices or alarm systems; agreed reletting charges; packing, removing, or storing property removed or stored under Par. 14; removing or booting illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to our negligence; animal-related charges under Par. 6 and 27; government fees or fines against us for violation (by you, your occupants, or your guests) of local ordinances relating to alarms and detection devices, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for our time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, plus attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease. You'll be liable to us for: (A) charges for replacing any keys and access devices referenced in Par. 5 if you don't return them all on or before your actual move-out date; (B) accelerated rent if you've violated Par. 32; and (C) a reletting fee if you've violated Par. 10. ***We may also deduct from your security deposit our reasonable costs incurred in rekeying security devices required by law if you vacate the apartment in breach of this Lease.***

**41. Deposit Return, Surrender, and Abandonment.**

**41.1 Your Deposit.** We'll mail you your security-deposit refund (less lawful deductions) and an itemized accounting of any deductions, no later than 30 days after surrender or abandonment, unless laws provide otherwise.

**41.2 Surrender.** You have ***surrendered*** the apartment when: (A) the move-out date has passed and no one is living in the apartment in our reasonable judgment; ***or*** (B) apartment keys and access devices listed in Par. 5 have been turned in to us—whichever happens first.

**41.3 Abandonment.** You have ***abandoned*** the apartment when all of the following have occurred: (A) everyone appears to have moved out in our reasonable judgment; (B) clothes, furniture, and personal belongings have been substantially removed in our reasonable judgment; (C) you've been in default for nonpayment of rent for 5 consecutive days, or water, gas, or electric service for the apartment not connected in our name has been terminated or transferred; ***and*** (D) you've not responded for 2 days to our notice left on the inside of the main entry door stating that we consider the apartment abandoned. An apartment is also considered abandoned 10 days after the death of a sole resident.

**41.4 The Ending of Your Rights.** Surrender, abandonment, or judicial eviction ends your right of possession for all purposes and gives us the immediate right to clean up, make repairs in, and relet the apartment; determine any security-deposit deductions; and remove property left in the apartment. Surrender, abandonment, and judicial eviction affect your rights to property left in the apartment (Par. 14), but don't affect our mitigation obligations (Par. 32).



## SUMMARY OF KEY INFORMATION

***The Lease will control if there's a conflict with this summary.***

- Address: 2011 Bandera Road Unit # 1010
- Beginning date of Lease (Par. 3) ____ ■ Ending date of Lease (Par. 3) ____
- Number of days notice for termination (Par. 3) 30 ■ Consent for guests staying more than ____ days (Par. 2)
- Total security deposit (Par. 4) $ 300.00 ■ Animal deposit (if any) $ ____
- Security deposit (Par. 4) ☐ does **OR** ☐ does not include an animal deposit.
- Security deposit refund check will be by (Par. 4) (***check one***) ☐ one check jointly payable to all residents (default), **OR** ☐ one check payable to and mailed to ____
- # of keys/access devices (Par. 5) for 1 unit, 1 mailbox, ____ other ____
- Your move-out notice will terminate Lease on (Par. 5): (***check one***) ☒ last day of month **OR** ☐ exact day designated in notice
- Check here ☐ if the dwelling is to be furnished (Par. 5) ■ Check here ☐ if there is a concession addendum
- Rent to be paid (Par. 6): (***check all that apply***) ☒ at the onsite manager's office, ☐ through our online payment site, OR ☒ at 2011 Bandera Rd.
- Check here if included in monthly rent: ☐ garage, ☐ storage, ☐ carport, ☐ washer/dryer, or ☐ other ____
- Total monthly rent (Par. 6) $ ____ ■ Prorated rent (Par. 6) for (*check one*) ☐ first month **OR** ☐ second month $ ____
- Late charges if rent is not paid on or before (Par. 6) 5th
- Initial late charge (Par. 6) $ 50.00 ■ Daily late charge (Par. 6) $ 5.00
- Returned-check charge (Par. 6) $ 25.00 ■ Animal violation charges (Par. 6) Initial $ 150.00 Daily $ 100.00
- Monthly animal rent (if any) $ ____
- Monthly pest control (if any) $ ____ ■ Monthly trash / waste (if any) $ ____
- Utilities paid by owner (Par. 7): (***check all that apply***) ☐ electricity, ☐ gas, ☐ water, ☐ wastewater, ☐ trash/recycling, ☐ cable/satellite, ☐ master antenna, ☐ Internet, ☐ stormwater/drainage, ☐ other ____
- Utility connection charge (Par. 12) $ 50.00 ■ You are: (***check one***) ☐ required to buy insurance **OR** ☒ not required to buy insurance (Par. 8)
- Agreed reletting charge (Par. 10) $ ____
- Special provisions (Par. 9): Rent is due on the 5th of each month on the 6th it is late with a $50 Late Fee and $5 a day. Water, Trash, Pest Control and Gas is a utility amount that is due on the 10th of each month. Refrigerator and stove will be provided by owner.

## Signatures and Attachments

**42. Attachments.** We will provide you with a copy of the Lease as required by statute. This may be in paper format, in an electronic format if you request it, or by e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease and given to you at signing. When an Inventory and Condition form is completed, both you and we should retain a copy. The items checked below are attached to and become a part of this Lease and are binding even if not initialed or signed.

- ☐ Access Gate Addendum
- ☐ Additional Special Provisions
- ☐ Allocation Addendum for: ☐ electricity ☐ water ☐ gas ☐ central system costs ☐ trash/recycling ☐ cable/satellite ☐ stormwater/drainage ☐ services/government fees
- ☐ Animal Addendum
- ☐ Apartment Rules or Community Policies
- ☐ Asbestos Addendum (if asbestos is present)
- ☐ Bed Bug Addendum
- ☐ Early Termination Addendum
- ☐ Enclosed Garage, Carport, or Storage Unit Addendum
- ☐ Intrusion Alarm Addendum
- ☐ Inventory & Condition Form
- ☐ Lead Hazard Information and Disclosure Addendum
- ☐ Lease Contract Guaranty (guaranties, if more than one)
- ☐ Legal Description of Apartment (optional, if rental term longer than one year)
- ☐ Military SCRA Addendum
- ☐ Mold Information and Prevention Addendum
- ☐ Move-Out Cleaning Instructions
- ☐ Notice of Intent to Move Out Form
- ☐ Parking Permit or Sticker (quantity: ____)
- ☐ Rent Concession Addendum
- ☐ Renter's or Liability Insurance Addendum
- ☐ Repair or Service Request Form
- ☐ Satellite Dish or Antenna Addendum
- ☐ Security Guidelines Addendum
- ☐ PUC Tenant Guide to Water Allocation
- ☐ Utility Submetering Addendum: ☐ electricity ☐ water ☐ gas
- ☐ Other ____
- ☐ Other ____
- ☐ Other ____
- ☐ Other ____

*Name, address and telephone number of locator service (if applicable—must be completed to verify TAA membership under Par. 35):*

____

**You are legally bound by this document. Please read it carefully.**

**A facsimile or electronic signature on this Lease is as binding as an original signature.**

**Before submitting a rental application or signing a Lease, you may take a copy of these documents to review and/or consult an attorney.**

**Additional provisions or changes may be made in the Lease if agreed to in writing by all parties.**

**You are entitled to receive a copy of this Lease after it is fully signed. Keep it in a safe place.**

**This lease is the entire agreement between you and us. You are NOT relying on any oral representations.**

***Resident or Residents** (all sign below)*

[signature] 11/3/17
(Name of Resident) Date signed

(Name of Resident) Date signed

(Name of Resident) Date signed

(Name of Resident) Date signed

(Name of Resident) Date signed

(Name of Resident) Date signed

***Owner or Owner's Representative** (signing on behalf of owner)*

[signature]

Address and phone number of owner's representative for notice purposes

____

After-hours phone number ____
(Always call 911 for police, fire, or medical emergencies.)

Date form is filled out (*same as on top of page 1*) 11/03/2017

**Exhibit B**

**Housing Assistance Payments Contract**
**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
**Office of Public and Indian Housing**
**OMB Approval 2577-0169 (Exp. 04/30/2018)**

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names and unit address, and owner's name and payment address is mandatory. The information is used to provide Section 8 tenant-based assistance under the Housing Choice Voucher program in the form of housing assistance payments. The information also specifies what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family or owner participation in the program.

**Instructions for use of HAP Contract**

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA). The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins). See section by section instructions. Part B Body of contract
Part C Tenancy addendum

**Use of this form**

Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.

However, the PHA may choose to add the following:

Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.

Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

**Use for special housing types**

In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

**How to fill in Part A**

Section by Section Instructions

Section 2: **Tenant**

Enter full name of tenant.

Section 3. **Contract Unit**

Enter address of unit, including apartment number, if any.

Section 4. **Household Members**

Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services for a family member who is a person with disabilities.

Section 5. **Initial Lease Term**

Enter first date and last date of initial lease term.

The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:

Such shorter term would improve housing opportunities for the tenant, and

Such shorter term is the prevailing local market practice.

Section 6. **Initial Rent to Owner**

Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

Section 7. **Housing Assistance Payment**

Enter the initial amount of the monthly housing assistance payment.

Section 8. **Utilities and Appliances.**

The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

# Housing Assistance Payments Contract (HAP Contract)
## Section 8 Tenant-Based Assistance
## Housing Choice Voucher Program

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract** This HAP contract has three parts:

    Part A: Contract Information
    Part B: Body of Contract Part
    C: Tenancy Addendum

2. **Tenant**

Elissa Lakricha White

3. **Contract Unit**

2011 Bandera #1010
San Antonio, TX 78228

4. **Household**

    The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of the owner and the PHA.

Elissa Lakricha White

5. **Initial Lease Term**

    The initial lease term begins on (mm/dd/yyyy): 11/08/2017

    The initial lease term ends on (mm/dd/yyyy): 11/30/2018

6. **Initial Rent to Owner**

    The initial rent to owner is: $ 750.00
    During the initial lease term, the owner may not raise the rent to owner.

7. **Initial Housing Assistance Payment**

The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is $ 750.00 per month.
The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

**8. Utilities and Appliances**

The owner shall provide or pay for the utilities and appliances indicated below by an " O". The tenant shall provide or pay for the utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | Provided by | Paid by |
|---|---|---|---|---|---|---|
| Heating | Natural gas ☐ | Bottle gas ☐ | Oil or Electric ☑ | ☐ Coal or Other | N/A | T |
| Cooking | Natural gas ☐ | Bottle gas ☐ | Oil or Electric ☑ | ☐ Coal or Other | N/A | T |
| Water Heating | Natural gas ☐ | Bottle gas ☐ | Oil or Electric ☑ | ☐ Coal or Other | N/A | T |
| Other Electric | | | | | N/A | T |
| Water | | | | | N/A | O |
| Sewer | | | | | N/A | O |
| Trash Collection | | | | | N/A | O |
| Air Conditioning | | | | | N/A | T |
| Refrigerator | | | | | O | N/A |
| Range/Microwave | | | | | O | N/A |
| Other (specify) | | | | | | |

**Signatures:**

**Public Housing Agency**

San Antonio Housing Authority
Print or Type Name of PHA

*Jeanette Perkins*
Jeanette Perkins (Dec 20, 2017)
Signature

Brandee Perez, Director of Federal Housing Programs
Print or Type Name and Title of Signatory

Dec 20, 2017
Date (mm/dd/yyyy)

**Owner**

2011 Bandera Road LLC
Print or Type Name of Owner

[signature]
Jeff [illegible] (Dec 20, 2017)
Signature

Owner
Print or Type Name and Title of Signatory

Dec 20, 2017
Date (mm/dd/yyyy)

**Mail Payments to:**

Name
2011 Bandera Road LLC

Address (street, city, State, Zip)
2011 Bandera Road [office]
San Antonio, TX 78228

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

## Part B of HAP Contract: Body of Contract

### 1. Purpose

a. This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

b. The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

c. During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

d. The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

### 2. Lease of Contract Unit

a The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

b The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

c The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

d The owner certifies that:

(1) The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.

(2) The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.

(3) The lease is consistent with State and local law.

e The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

### 3. Maintenance, Utilities, and Other Services

a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

b. The owner must provide all utilities needed to comply with the HQS.

c. If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

e. The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

f. The PHA must notify the owner of any HQS defects shown by the inspection.

g. The owner must provide all housing services as agreed to in the lease.

### 4. Term of HAP Contract

a. **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

b. **When HAP contract terminates.**

(1) The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.

(2) The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.

(3) If the family moves from the contract unit, the HAP contract terminates automatically.

(4) The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.

(5) The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.

(6) The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in aide.

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

**5. Provision and Payment for Utilities and Appliances**

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

**6. Rent to Owner: Reasonable Rent**

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:

(1) The location, quality, size, unit type, and age of the contract unit; and

(2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must redetermine the reasonable rent when required in accordance with HUD requirements. The PHA may redetermine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

**7. PHA Payment to Owner**

a. When paid

(1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.

(2) The PHA must pay housing assistance payments promptly when due to the owner.

(3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market, governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

(4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. **Owner compliance with HAP contract.** Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. **Amount of PHA payment to owner**

(1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.

(2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.

(3) The housing assistance payment for the first month of the HAP contract term shall be prorated for a partial month.

d. **Application of payment.** The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e **Limit of PHA responsibility.**

(1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.

(2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f **Overpayment to owner.** If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

**8. Owner Certification**

During the term of this contract, the owner certifies that:

a. The owner is maintaining the contract unit and premises in accordance with the HQS.

b. The contract unit is leased to the tenant. The lease includes the tenancy addendum (Part C of the HAP contract), and is in accordance with the HAP contract and program requirements. The owner has provided the lease to the PHA, including any revisions of the lease.

c. The rent to owner does not exceed rents charged by the owner for rental of comparable unassisted units in the premises.

d. Except for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term.

e. The family does not own or have any interest in the contract unit.

f. To the best of the owner's knowledge, the members of the family reside in the contract unit, and the unit is the family's only residence.

g. The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister, or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

**9. Prohibition of Discrimination**. In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:

a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract.

b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

**10. Owner's Breach of HAP Contract**

a. Any of the following actions by the owner (including a principal or other interested party) is a breach of the HAP contract by the owner:

(1) If the owner has violated any obligation under the HAP contract, including the owner's obligation to maintain the unit in accordance with the HQS.

(2) If the owner has violated any obligation under any other housing assistance payments contract under Section 8.

(3) If the owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing assistance program.

(4) For projects with mortgages insured by HUD or loans made by HUD, if the owner has failed to comply with the regulations for the applicable mortgage insurance or loan program, with the mortgage or mortgage note, or with the regulatory agreement; or if the owner has committed fraud, bribery or any other corrupt or criminal act in connection with the mortgage or loan.

(5) If the owner has engaged in any drug-related criminal activity or any violent criminal activity.

b. If the PHA determines that a breach has occurred, the PHA may exercise any of its rights and remedies under the HAP contract, or any other available rights and remedies for such breach. The PHA shall notify the owner of such determination, including a brief statement of the reasons for the determination. The notice by the PHA to the owner may require the owner to take corrective action, as verified or determined by the PHA, by a deadline prescribed in the notice.

c. The PHA's rights and remedies for owner breach of the HAP contract include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.

d. The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages.

e. Even if the family continues to live in the contract unit, the PHA may exercise any rights and remedies for owner breach of the HAP contract.

f. The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is not a waiver of the right to exercise that or any other right or remedy at any time.

**11. PHA and HUD Access to Premises and Owner's Records**

a. The owner must provide any information pertinent to the HAP contract that the PHA or HUD may reasonably require.

b. The PHA, HUD and the Comptroller General of the United States shall have full and free access to the contract unit and the premises, and to all accounts and other records of the owner that are relevant to the HAP contract, including the right to examine or audit the records and to make copies.

c. The owner must grant such access to computerized or other electronic records, and to any computers, equipment or facilities containing such records, and must provide any information or assistance needed to access the records.

**12. Exclusion of Third Party Rights**

a. The family is not a party to or third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B.

b. The tenant or the PHA may enforce the tenancy addendum (Part C of the HAP contract) against the owner, and may exercise any right or remedy against the owner under the tenancy addendum.

c. The PHA does not assume any responsibility for injury to, or any liability to, any person injured as a result of the owner's action or failure to act in connection with management of the contract unit or the premises or with implementation of the HAP contract, or as a result of any other action or failure to act by the owner.

d. The owner is not the agent of the PHA, and the HAP contract does not create or affect any relationship between the PHA and any lender to the owner or any suppliers, employees, contractors or subcontractors used by the owner in connection with management of

the contract unit or the premises or with implementation of the HAP contract.

**13. Conflict of Interest**

a. "Covered individual" means a person or entity who is a member of any of the following classes:
   (1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);
   (2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;
   (3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or
   (4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

**14. Assignment of the HAP Contract**

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:
   (1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or
   (2) A court or administrative agency has determined that the owner or proposed new owner violated the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):
   (1) Has violated obligations under a housing assistance payments contract under Section 8;
   (2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;
   (3) Has engaged in any drug-related criminal activity or any violent criminal activity;
   (4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;
   (5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:
      (a) Threatens the right to peaceful enjoyment of the premises by other residents;
      (b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;
      (c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or
      (d) Is drug-related criminal activity or violent criminal activity;
   (6) Has a history or practice of renting units that fail to meet State or local housing codes; or
   (7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

**15. Foreclosure.** In the case of any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does not affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

**16. Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

**17. Entire Agreement: Interpretation**

a. The HAP contract contains the entire agreement between the owner and the PHA.

b The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

**Housing Assistance Payments Contract (HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Department of Housing and Urban Development
Office of Public and Indian Housing

## Part C of HAP Contract: Tenancy Addendum

### 1. Section 8 Voucher Program

a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).

b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

### 2. Lease

a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.

b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

### 3. Use of Contract Unit

a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.

b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.

c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.

d. The tenant may not sublease or let the unit.

e. The tenant may not assign the lease or transfer the unit.

### 4. Rent to Owner

a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.

b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:

(1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or

(2) Rent charged by the owner for comparable unassisted units in the premises.

### 5. Family Payment to Owner

a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.

b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.

c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.

e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.

f. The owner must immediately return any excess rent payment to the tenant.

### 6. Other Fees and Charges

a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.

b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.

c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

### 7. Maintenance, Utilities, and Other Services

a Maintenance

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

b. **Utilities and appliances**

(1) The owner must provide all utilities needed to comply with the HQS.

(2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:

(a) Pay for any utilities that are to be paid by the tenant.

(b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d **Housing services.** The owner must provide all housing services as agreed to in the lease.

## 8. Termination of Tenancy by Owner

a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:

(1) Serious or repeated violation of the lease;

(2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;

(3) Criminal activity or alcohol abuse (as provided in paragraph c); or

(4) Other good cause (as provided in paragraph d).

c **Criminal activity or alcohol abuse.**

(1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:

(a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);

(b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;

(c) Any violent criminal activity on or near the premises; or

(d) Any drug-related criminal activity on or near the premises.

(2) The owner may terminate the tenancy during the term of the lease if any member of the household is:

(a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or

(b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d **Other good cause for termination of tenancy**

(1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.

(2) During the initial lease term or during any extension term, other good cause may include:

(a) Disturbance of neighbors,

(b) Destruction of property, or

(c) Living or housekeeping habits that cause damage to the unit or premises.

(3) After the initial lease term, such good cause may include:

(a) The tenant's failure to accept the owner's offer of a new lease or revision;

(b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or

(c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).

(5) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.

(6) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This

provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

**e. Protections for Victims of Abuse.**

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

**f. Eviction by court action.** The owner may only evict the tenant by a court action.

**g. Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

**9. Lease: Relation to HAP Contract**

If the HAP contract terminates for any reason, the lease terminates automatically.

**10. PHA Termination of Assistance**

The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

**11. Family Move Out**

The tenant must notify the PHA and the owner before the family moves out of the unit.

**12. Security Deposit**

a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

## 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

## 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

## 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2) If there are any changes in lease provisions governing the term of the lease;

(3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

## 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

## 17. Definitions

**Contract unit.** The housing unit rented by the tenant with assistance under the program.

**Family.** The persons who may reside in the unit with assistance under the program.

**HAP contract.** The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

**Household.** The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

**Housing quality standards (HQS).** The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

**HUD.** The U.S. Department of Housing and Urban Development.

**HUD requirements.** HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

**Lease.** The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

**PHA.** Public Housing Agency.

**Premises.** The building or complex in which the contract unit is located, including common areas and grounds.

**Program.** The Section 8 housing choice voucher program.

**Rent to owner.** The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

**Section 8.** Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

**Tenant.** The family member (or members) who leases the unit from the owner.

**Voucher program.** The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

JS 44 (Rev. 06/17)

SEALED

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Elissa L. White

**(b)** County of Residence of First Listed Plaintiff Bexar
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Alex Stamm, Texas RioGrande Legal Aid
1111 N. Main Ave., San Antonio, Texas 78212
(210) 212-3728

**DEFENDANTS**

2011 Bandera Road LLC

County of Residence of First Listed Defendant Bexar
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

SA20CA0488 FB

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☒ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☒ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. 3729

Brief description of cause:
Qui Tam / False Claims Act relating to the receipt of federal housing subsidies

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. **DEMAND $** CHECK YES only if demanded in complaint: **JURY DEMAND:** ☐ Yes ☒ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*: JUDGE DOCKET NUMBER

DATE 04/23/2020 SIGNATURE OF ATTORNEY OF RECORD /s/ Alexander A. Stamm

FOR OFFICE USE ONLY

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE MJ-HJB